IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

JASPER BLACK,

                Plaintiff,

v.                                                               CIVIL  ACTION  NO.  3:11-0675

ERIC SHINSEKI,
SECRETARY, DEPARTMENT OF
VETERAN AFFAIRS,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Eric Shinseki's Motion for Summary Judgment (ECF No. 34). For the reasons stated below, the motion is **GRANTED.** The Court **GRANTS** summary judgment in favor of Defendant as to all Counts.

### I.   Statement of Facts

This litigation stems from Plaintiff Jasper Black's termination from the Department of Veterans Affairs. On January 22, 2008, Plaintiff began employment as a Veterans Service Representative ("VSR") in the Department's Veterans Administration Regional Office in Huntington, West Virginia. He was hired through the Career Intern Program and would be treated as a probationary employee through the first two years of his employment. Ex. 16, ECF No. 40-16.

VSRs assess benefit claims made by veterans. Their duties include reviewing documents and information submitted by veterans, conducting interviews, evaluating if the veteran is entitled to the requested benefits, and communicating those decisions. Supervisors review and

grade each VSR's work, assessing whether the VSR is meeting established performance standards. Each VSR is required to main a "quality of work"[1] rating of at least 80% and a "productivity"[2] rating of at least 4.0. A computer program called ASPEN tracks each employee's work and scores.

Plaintiff has a history of neck and back pain pre-dating his employment as a VSR. He states that he was diagnosed with degenerative disk disease and cervical spinal stenosis in November 2006. Compl. ¶ 30, ECF No. 1. Beginning on or around September 17, 2008, Plaintiff was absent from work for reasons related to these medical issues. Around that time, he "requested FMLA, advanced sick and/or leave donation so that he could have surgery to correct the degenerative disc disease." Id. ¶ 31. The Regional Office subsequently requested, via phone and e-mail, that Plaintiff provide specified documents and information to confirm his "incapacitation" for work, and instructed Plaintiff that doctors notes stating he was "to be off work" would not suffice. E-mail from Harriet Howell,[3] Sept. 19, 2008, Ex. 23, ECF No. 41-3;

---

[1] As explained in the pleadings and exhibits, "quality of work" refers to the correctness and completeness of the employee's work. "Quality of work" scores are based on a random sampling of the employee's work. For each piece of work scored, an employee receives a score of either 100% or 0%, and these scores are averaged to produce a "quality of work" score.

[2] "Productivity" refers to the number of "weighted actions" an employee performs each day. Generally, actions are "weighted" according to the complexity or amount of time a given task is expected to consume. A "productivity" score of 4.0 means that an employee, on average, completes four weighted actions in an eight-hour workday.

[3] Harriett Howell was one of Plaintiff's supervisors. Plaintiff alleges that he had four different supervisors during his employment, as follows: 1) Jim Beatty (white male) from January 2008 to March 2008; 2) Laura Finlay (white female) from March 2008 to May 2008; 3) Lisa Cadle (white female) from May 2008 to June 2008; 4) Laura Finlay again from June 2008 to August 2008; and 5) Harriet Howell (white female) from August 2008 to January 2009. Compl. ¶ 11. Employees were also assigned "senior coaches" and/or "assistant coaches," who were senior employees meant to provide guidance to newer employees. Ms. Finlay, Ms. Howell, Ms. Cadle, and Mr. Beatty acted as "senior coaches," and a woman named Sheila Floyd acted as an "assistant coach" to Plaintiff. Id. ¶ 15.

*see also* E-mail from Laura Finlay, Sept. 25, 2008, Ex. 30, ECF No. 34. On September 22, 2008, Plaintiff was sent a memorandum instructing him to submit the needed medical paperwork within 14 days. Ex. 32, ECF No. 34.

On September 26, 2008, in the midst of ongoing efforts to resolve Plaintiff's medical issues and leave from work, supervisor Harriet Howell sent Plaintiff a "memo" to inform him that his average performance scores from "latter July 2008" to that point did not meet the standards in place. Ex. 37, ECF No. 41-17 (noting his average production score of 2.63 and average quality score of 75%). Plaintiff had been alerted to problems with this work in the past. *See* E-mail from Ms. Finlay to Pl., June 2, 2008, Ex. 10, ECF No. 34 (regarding a "tough case," telling Plaintiff to read her notes and expressing concern with his "haphazard" work); E-mail from Ms. Finlay to Pl., Apr. 14, 2008, Ex. 9, ECF No. 34 (instructing Plaintiff to re-do certain work with the help of another VSR).

On September 29, 2008, supervisor Laura Finlay and human resources liaison Alan Taylor called Plaintiff to explain the need for specific documentation of his medical condition. They also discussed his sub-standard performance scores. E-mail from Mr. Taylor to Ms. Finlay, Sept. 29, 2008, Ex. 19, ECF No. 34 (summarizing phone conversation with Plaintiff and stating that "I told him he needed to understand if he did not bring his numbers up, to where they are expected to be, it would indeed lead to his removal").

On October 7, 2008, Harriet Howell informed Plaintiff via e-mail that the Office had not received the requested medical documents, noting that:

> We have received week-to-week medical excuses from your family physician indicating you need to be off work due to illness but no information has been received explaining your incapacitation for work. At this time, we have denied your request for Leave Without Pay (LWOP), Advanced Sick Leave (ASL) and/or Voluntary Leave Donation consideration. Your absence from work since

September 17, 2008, will be coded as Absent Without Leave (AWOL) for any
period not covered by accrued annual or sick leave.

Ex. 32, ECF No. 34. Plaintiff replied via e-mail to Ms. Howell that same day, thanking her for

the e-mail, explaining that he would tell the doctors "the importance of the wording" of their

notes, and asking if the denial could later be appealed. *Id.*

On October 20, 2008, Joseph Beaudoin, a Veterans Service Center Manager, sent

Plaintiff a letter explaining that the only medical report Plaintiff had provided—from Dr. Melissa

Smith—failed to support extending leave. Because of this, Plaintiff's request for advanced sick

leave and participation in the leave donation program was denied, and he ordered Plaintiff to

"report back to work effective October 21st, 2008." Ex. 33, ECF No. 34. Plaintiff returned to

work as requested.

After Plaintiff's return to work, and in the midst of these recurring health issues, the

Office again alerted Plaintiff to his substandard work performance. On November 12, 2008, Ms.

Howell sent Plaintiff an e-mail memorializing a discussion between them, in which she told

Plaintiff that his productivity score since returning to work was 2.99. Ex. 21, ECF No. 34.  In a

memorandum dated November 26, 2008, Ms. Howell noted another discussion with Plaintiff,

where she told him that his productivity rate was 3.36 and that his quality score was 0%. Ex. 22,

ECF No. 34.  They also discussed ways to improve his scores.[4]

In early November 2008, at the request of his doctor, Plaintiff asked his employer for an

ergonomic consultation to figure out ways to reduce his physical pain at work. An industrial

hygienist with the Department provided Plaintiff a consultation on November 14,  and

---

[4]  Additionally, an e-mail from Ms. Howell to Ms. Finlay dated December 18, 2008, lists
correspondence with Plaintiff regarding productivity and quality as follows: an August 28, 2008,
meeting regarding productivity; an e-mail on November 5, 2008, regarding productivity; a
meeting on November 10, 2008, and a follow-up e-mail on November 12, 2008; a meeting on
November 26, 2008; and an e-mail on December 8, 2008. Ex. 24, ECF No. 34.

recommended that Plaintiff be provided with a fully adjustable chair, contoured lumbar support, a keyboard wrist rest, a mouse pad with wrist rest, a foot rest, and a keyboard that could be adjusted to standing position. The industrial hygienist also recommended frequent breaks. E-mail from George Disney to Alan Taylor, Nov. 14, 2008, Ex. 17, ECF No. 40-17. Around that same time, however, Ms. Finlay suggested that the supervisors decide whether to terminate Plaintiff based on his poor job performance. E-mail from Ms. Finlay, Nov. 17, 2008, Interrog. 5, ECF No. 34-1 at 144.

On December 12, 2008, Regional Office Director Zita Commons met with Plaintiff and informed him that he was being terminated for poor performance and that his termination would be effective January 3, 2009. This meeting became quite heated, and although Plaintiff was initially expected to work up until January 3, he was instead placed on administrative leave starting on December 15.

Plaintiff subsequently filed the pending Complaint against Eric Shinseki, Secretary of Veterans Affairs, alleging the following claims:

    Count I:     Discrimination on the basis of disability
    Count II:    Denial of reasonable accommodation
    Count III:   Discrimination based on race
    Count IV:    Retaliation
    Count V:     Hostile work environment and harassment

In summary, Plaintiff argues that his former employer discriminated against him based on his degenerative disc disease and cervical spinal stenosis, conditions of which his employer was aware and which caused him physical pain at work. As to his claim for racial discrimination, Plaintiff is African-American, and he states that he was the only African-American on his VSR team. Furthermore, he had four different supervisors during his employment, all of whom were Caucasian. He argues that fellow employees treated him differently based on his race.

Defendant filed the pending motion for summary judgment, requesting summary judgment on all five of Plaintiff's claims. ECF No. 34. Plaintiff responded that there is a genuine issue of material fact as to all five claims and that, therefore, summary judgment is not appropriate at this time. ECF No. 40. Defendant filed a reply, ECF No. 42, and a notice of additional authority, ECF No. 43.[5] The motion for summary judgment is now ripe for resolution.

In Section II, the Court will explain the standard for granting summary judgment. Sections III through VII individually assess each of Plaintiff's five Counts to determine if summary judgment is appropriate on each Count.

## II.    Summary Judgment Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citation omitted).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for

---

[5] This notice of additional authority brought to the Court's attention a United States Supreme Court decision that was handed down on June 24, 2013, regarding the burden of proof in retaliation cases. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III.   Discrimination Based on Race (Count III)

Plaintiff alleges that he was discriminated against by his employer because he is African-American:

> As an African-American, the Plaintiff, among other things, was treated differently with respect to the amount of work he was given to help him meet the performance standards; the way in which his worked was graded; failing to place him on a performance improvement plan; terminating him while he was on probation; requiring him to return to work while he was out on medical leave; harassing him at home while he was on medical leave; retroactively lowering of Plaintiff's already assigned ratings, ensuring that he would not meet his production and quality standards; placing him on LWOP rather than giving him advanced sick leave; disallowing FMLA leave and advanced sick leave; and allowing other probationary employees FMLA, advanced sick leave or other leave while denying the Plaintiff similar leave.

Compl. ¶ 61. Defendant argues that summary judgment on this claim is appropriate because Plaintiff has provided no direct or circumstantial evidence of racial discrimination.

Plaintiff argues that he can show discrimination under the *McDonnell Douglas* framework. This framework is as follows:

> [T]he plaintiff-employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case "drops out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (emphasis in original) (citations omitted) (discussing the framework based on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

To avoid summary judgment under this framework, "the plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004). This means that, first, the plaintiff must present enough evidence from which a juror could reasonably find that a prima facie case exists. In other words, the plaintiff must show that:

 (1) she is a member of a protected class; (2) her employer had an open position for which she applied; (3) she was qualified for the position; (4) she was rejected for the position under circumstance giving rise to an inference of unlawful discrimination.

*Id.* at 468 (citing *Taylor v. Va. Union Univ.,* 193 F.3d 219, 230 (4th Cir. 1999)). If the employer presents a legitimate, non-discriminatory reason for the conduct, then the burden shifts back to the plaintiff, who must then present sufficient evidence from which a reasonable juror could find that the employer's proffered reason is pretextual. In other words, there must be sufficient evidence for a reasonable juror to find, by a preponderance of the evidence, that the employer's explanation is pretextual and that discrimination in fact was a motivation behind the employer's action. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *Price v. Thompson*, 380 F.3d 209 (4th Cir. 2004).

The evidence of discrimination in this case is circumstantial and creates a challenge in assessing the appropriateness of summary judgment. Plaintiff points out that he was the only African-American on his team of co-workers and that very few African-Americans were in his office as a whole. All of his direct supervisors were Caucasian; Office Director Zita Commons, however, is African-American. At his termination meeting with Ms. Commons, Plaintiff exclaimed something to the effect of "everyone is after Jasper Black because he's black." Pl.'s Dep. at 38. He explains responsibility for his termination as follows:

The Acting Service Center Manager (SCM) at the time, Laura Finlay, recommended my termination from my position for failure to qualify during my

8

probationary/trial period. After careful review, the Director, Zita Commons, made the decision to terminate my employment due to alleged unsatisfactory performance.

Aff. of Jasper Black, *In the Matter of the EEO Complaint of Discrimination*, at 12, Ex. 10, ECF No. 40-10 ("Pl.'s EEO Aff."). He concedes that Ms. Commons did not discriminate against him based on race, Pl.'s Dep. at 59: 1-3,[6] but suggests that other employees may have.

Although Plaintiff alleges that management retroactively lowered his scores—and includes many pages of printouts from ASPEN in the exhibits—Plaintiff does not explain how these printouts show that his scores were intentionally or retroactively lowered. Plaintiff additionally argues that other employees besides himself made mistakes but were treated more favorably than Plaintiff. For example, Plaintiff argues, supervisors exhibited favoritism toward certain employees, providing them with more assistance, greater leniency in correcting mistakes, and more work to complete to increase their scores. Arbutus Stone, "an authorizer and long-time VSR/GS-11," allegedly informed Plaintiff that "there were other white probationary VSRs who made just as many mistakes as [Plaintiff] did, yet they were given their work back so they could correct it." Pl.'s EEO Aff. at 20. There is no indication that Mr. Stone was a senior administrator or otherwise had authority to speak on behalf of the Office, such that his statements could be imputed to the Office. The Court finds that Plaintiff's recitation of Mr. Stone's comments constitutes hearsay and is not otherwise admissible. Furthermore, Plaintiff provides no independent evidence of racial animus from his supervisors here.

Plaintiff names the other probationary VSRs—five people in all—and states that although "we were supposed to be given ample opportunity to fix the problems and receive extra training where needed[ ] [i]t seem[ed] as if everyone else received these concessions but [him]." Pl.'s

---

[6] "Q: So you don't accuse [Ms. Commons] of engaging in race discrimination?
A: No."

EEO Aff. at 20. That statement, however, is Plaintiff's own opinion, and he provides no evidence in support of this assertion. In fact, Plaintiff's e-mails in evidence indicate the opposite—that, up until his termination, he was satisfied with the supervisors' willingness to provide him feedback or extra guidance.

Plaintiff also allegedly showed his termination letter to David Cooney, another VSR/GS-11, and Mr. Cooney said, "Someone must have had it out for you." Mr. Cooney then allegedly explained that "he had never heard of anyone being terminated for the stated reason [for which Plaintiff] was terminated." Pl.'s EEO Aff. at 16. As with Mr. Stone, Mr. Cooney does not appear to be in a position of authority to speak on behalf of the Office, and his statement appears to merely be speculation and inadmissible hearsay.

Plaintiff also supports his allegations by pointing to the affidavit of Rick Neely, a Caucasian former VSR and co-worker. In this affidavit, Mr. Neely recites a conversation he overheard soon after Plaintiff was terminated, in which Sheila Floyd was speaking on the phone. Ms. Floyd allegedly said that "[t]hey couldn't prove anything about changing his evaluation and . . . he was crazy." *Id.* ¶ 4. Ms. Floyd did not mention Plaintiff's name, but Mr. Neely believes that she could have only been referring to Plaintiff. Mr. Neely also recalls Ms. Floyd saying multiple times that Plaintiff "needed to go back to his desk to take his 'Crazy Pills'." Aff. of Rick Neely at 2, Ex. 40, ECF No. 41-20. He stated that he "never understood why Sheila would help certain employees she liked but leave the rest of the employees she didn't like to struggle." *Id.*

Although it may be true that Plaintiff's supervisors favored certain employees over others in assigning work and providing assistance, this favoritism alone is not sufficient to show racial discrimination. *Belton v. City of Charlotte*, 175 F. App'x 641, 655 (4th Cir. 2006) ("Even if [a supervisor] selectively assigns special projects to favored employees and thereby grooms them

for promotion, favoritism alone does not prove racial discrimination."). Employees other than Plaintiff were also treated disfavorably. However, Plaintiff—the only African-American probationary employee—was the only employee terminated. The Court notes that "an employer's method of determining which employees to discharge [can be] evidence of possible discriminatory intent." *Hardin v. Hussmann Corp.*, 45 F.3d 262, 266 (8th Cir. 1995), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Although Plaintiff's performance scores, if correctly reported, certainly would have qualified him for termination, Plaintiff offered no evidence on whether other VSRs had substandard scores and whether Defendant responded to Plaintiff's work product differently than it responded to those of other employees. Furthermore, as to Plaintiff's comment that "everyone is out to get [him] because he is black," the Fourth Circuit has noted that "a plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination." *Mackey*, 360 F.3d at 469-70 (citing *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988)).

The Court finds that Plaintiff has not created a genuine issue of fact as to whether Defendant engaged in racial discrimination. Plaintiff points to no comments that indicate racial animus. One former employee allegedly told Plaintiff that white probationary employees were treated better, but Plaintiff has not developed any evidence to show that this is the case, other than blanket statements about favoritism. Furthermore, Mr. Neely's statements about favoritism indicate that non-African-American employees were treated badly as well. Although Plaintiff was the only probationary employee terminated, there is no evidence presented regarding those other employees' scores, despite ample time for Plaintiff to develop such evidence. Overall, Plaintiff may have provided sufficient evidence to establish a prima facie case, but in the face of his employer's legitimate reasons for its actions, Plaintiff does not provide sufficient evidence

from which a reasonable juror could find that the proffered reasons are pretextual and that Plaintiff has proved a discriminatory motive by a preponderance of the evidence.[7]

The Court does not make this decision lightly. Racial discrimination sometimes only reveals itself in subtle, indirect ways, and in such situations the plaintiff's ultimate success will depend on careful weighing of the evidence and credibility determinations. However, in a case where the plaintiff fails to provide sufficient evidence from which a juror could find discrimination on the basis of race, the Court must not allow the case to proceed to trial. Therefore, the Court grants summary judgment for Defendant on Count III.[8]

### IV.   Discrimination Based on Disability (Count I)

Plaintiff alleges that he "was a qualified individual with a disability"—multilevel degenerative disc disease and cervical spinal stenosis—which affected his "ability to sit, work and walk, among other things." Compl. ¶ 54. He also alleges that other employees were aware of his disability, and that:

> After the Agency's employees learned of the Plaintiff's disability, they began to discriminate against him. This discrimination included restricting the amount of work the Plaintiff received, which affected his performance; giving the Plaintiff

---

[7] Defendant additionally argues that Plaintiff's claim for racial discrimination fails because Ms. Commons made an independent decision to terminate Plaintiff's employment. *See Long v. Eastfield Coll.*, 88 F.3d 300, 307-08 (5th Cir. 1996). Because that case involves a retaliation claim—where a causal connection is a discrete element—and because summary judgment is granted on other grounds, the Court need not reach the issue of *Long*'s applicability to this Count.

[8] Plaintiff argues that an alternative way for him to prove racial discrimination is based on the mixed motives test found in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). To succeed under this test, Plaintiff would have to show that race was a motivating factor in a given employment practice. However, if the employer shows that it would have engaged in the same conduct even if the wrongful motivating factor were not present, then the plaintiff is limited in the damages he can receive. *Id.* at 94-95 (citing the 1991 Civil Rights Act). Based on the recitation of evidence, the Court finds that there is insufficient evidence from which a reasonable juror could find that race or any other impermissible consideration was a motivating factor in Defendant's employment actions such that liability under the mixed motives test attaches.

lower ratings; restricting the amount of help the Plaintiff received on his work, unlike the case with out [sic] non-disabled individuals; and evaluating the Plaintiff's work using a stricter standard.

*Id.* ¶ 55. Plaintiff alleges that this conduct violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.[9]

To succeed on this claim, Plaintiff must demonstrate that: "(1) [he] has a disability under the [Rehabilitation Act]; (2) [he] is qualified for the employment in question; and (3) [he] suffered an adverse employment action due to discrimination on the basis of disability." *Brockman v. Snow*, 217 F. App'x 201, 208 (4th Cir. 2007) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995)). Like with racial discrimination, the *McDonnell Douglas* framework is applied to disability claims brought under the Rehabilitation Act. *Id.* Therefore, we must assess whether Plaintiff provides sufficient evidence to show a prima facie case, whether his employer provides a legitimate non-discriminatory reason for the adverse action, and whether Plaintiff provides sufficient evidence from which to find that his employer's explanation is pretextual.

Plaintiff creates a genuine issue of fact as to the first prong: whether he has a disability. Under the Rehabilitation Act, a "disability" is "a physical or mental impairment that constitutes or results in a substantial impediment to employment" or "a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(9)

---

[9] Federal employees cannot pursue recovery under the Americans with Disability Act ("ADA"). 42 U.S.C. § 12111(5)(B)(i) (2009) (excluding the United States as an employer covered by the Act). Instead, they can seek recourse under the Rehabilitation Act. *Brockman v. Snow*, 217 F. App'x 201 (4th Cir. 2007). However, interpretation of the ADA applies to interpretation of the Rehabilitation Act. *Id.* at 208 (citing *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir. 1995)) ("The [Rehabilitation Act] is also interpreted using the law applicable to the Americans with Disabilities Act.").

(2010) (referring to 42 U.S.C. § 12102 (2009)). Although Defendant disputes awareness[10] of Plaintiff's disability, it never meaningfully disputes that Plaintiff's condition was in fact a disability. Indeed, Plaintiff describes in detail the pain and discomfort he felt while working, noting that he was constantly working in pain. This is sufficient to create a genuine issue as to the first prong.

Plaintiff also sufficiently creates a genuine issue of fact as to the second prong: his qualification for employment. A "qualified individual" is defined as:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8) (2009). Federal regulations clarify that "[t]he term 'qualified' . . . means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m) (2012). This prong looks not only at an individual's ability to meet the requirements of the job when hired, but also at whether he or she meets its demands as employment continues. *Id.* (referring to "the employment position such individual *holds or desires*") (emphasis added); *see also Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 786 (8th Cir. 1998). The job description for a VSR states that "[t]he work normally involves mental rather than physical exertion. The work is mostly sedentary. However, there may be some walking, standing, and carrying of light items such as papers, books, claims folders, and files." Position Description—Veterans Service Representative, Factor 8—Physical Demands, Ex. 15, ECF No. 40-15. Defendant summarily

---

[10] Defendant's awareness is relevant to the third prong of the prima facie case.

states that Plaintiff was not qualified, but as Plaintiff points out, Defendant does not provide any supporting explanation. Laura Finlay admitted in an interrogatory that Plaintiff was qualified for employment as a VSR, notwithstanding consideration of his disability. Def.'s Answers to Pl.'s First Interrog., No. 3, Ex. 41, ECF No. 41-21. Furthermore, the industrial hygienist who performed Plaintiff's ergonomic consultation stated that "[t]he aforementioned recommendations I feel will help him physically and mentally and will help him become a more productive employee." E-mail from George Disney, Nov. 14, 2008, Ex. 17, ECF No. 40-17. This at the least creates a genuine issue of fact as to the second prong.

For the third prong, Plaintiff must show discrimination based on disability, which is only possible if the employer was aware of the condition. It is not enough that the disability is documented in some way; rather, Defendant must also be *aware* of the record of disability. *See* Gary Phelan & Janet Bond Arterton, <u>Disability Discrimination in the Workplace</u> § 4:11, Federal Discrimination Laws, Record of Impairment (2013) (citing *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 180 (D. Me. 2010); *Norden v. Samper*, 503 F. Supp. 2d 130 (D.D.C. 2007)). Plaintiff provided several doctors notes stating that Plaintiff should be excused from work for illness and/or tests, but the notes did not state what the illness was or provide any further explanation. Ex. 32, ECF No. 41-12. Plaintiff also provided a letter to his employer dated October 7, 2008, from Dr. Melissa Smith. Ex. 34, ECF No. 41-14. This letter noted that: Dr. Smith saw Plaintiff for a neurologic evaluation of back pain; Plaintiff stated he had a history of pain; she recommends he not lift loads greater than ten pounds; and he should "abstain from extensive daily stress until evaluation of his multiple complaints." *Id.* Plaintiff also had multiple discussions with his supervisors in person and over e-mail about his medical problems. An e-mail from Plaintiff to Ms. Howell states that his doctor "wrote an order for the [ergonomic]

workstation." Ex. 28, ECF No. 41-8. Ms. Howell replied that she "will need the order for the ergonomics so [she] can pass it on." *Id.* The actual doctor's note requesting the consult is not included in evidence. In a letter dated December 17, 2008, and addressed to Ms. Commons, Dr. Thomas Mroz recites Plaintiff's complaints of pain and recommends an MRI and CT scan. Ex. 35, ECF No. 34.

Based on this evidence, Plaintiff has created a genuine issue of fact as to Defendant's awareness of his disability. The record documents the duration of his disability and the pain he experienced. Although the doctors did not use the word "incapacitated," at least one doctor noted that Plaintiff should have an ergonomic consultation and wrote a request to this effect. It may be true that Plaintiff did not provide the necessary paperwork to Defendant showing that he was "incapacitated" from work,[11] as Defendant repeatedly points out. However, this in itself does not necessarily mean that Defendant was not aware of Plaintiff's disability for purposes of Rehabilitation Act liability. The Court finds that Plaintiff's situation is distinguishable from that in *Brockman v. Snow*, 217 F. App'x 201 (4th Cir. 2007), where the Fourth Circuit Court of Appeals affirmed summary judgment against a plaintiff on her Rehabilitation Act claim. In that case, the Fourth Circuit noted that the plaintiff "offer[ed] no evidence of the duration of her impairment, nor of its severity," and she had not provided sufficient evidence demonstrating that pregnancy complications substantially limited a major life activity. *Id.* at 209. Here, however, Plaintiff does demonstrate the duration of his disability and its severity.

---

[11] Defendant argues that Plaintiff cannot succeed on this claim because Plaintiff frustrated the collection of information about his disability. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996) ("The fact that the missing information concerns the employee's medical condition might not always indicate that the employee is responsible for failing to specify a necessary accommodation, but where, as here, the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts."). However, the Court need not resolve application of this consideration for this Count, and instead grants summary judgment on other grounds.

Defendant counters that there is a legitimate reason for Plaintiff's termination: Plaintiff's poor job performance. Defendant excluded the period of Plaintiff's prolonged absence from calculation of his performance scores. Therefore, Plaintiff's poor scores were not the result of days of absence for which he automatically received scores of "zero." Defendant indicated that although Plaintiff's request for leave without pay, advanced sick leave, and voluntary leave donation was denied, Defendant tried to work with Plaintiff to find a solution in the first place by allowing him an approximately one month absence from work and showing patience as Plaintiff attempted to collect medical documents.

Plaintiff's termination for poor performance was decided around the same time that he attempted to provide medical information. Temporal proximity between his termination and his attempts to provide information regarding his disability, however, is not dispositive of disability-based discrimination, in light of Defendant's proffered legitimate reason for termination—a reason which Plaintiff does not show to be pretextual. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Plaintiff has not demonstrated that his scores were retroactively lowered, or that he was treated more harshly than other probationary employees based on his disability. This Court finds that Plaintiff has not presented sufficient evidence from which a reasonable juror could find that Plaintiff succeeds in showing discrimination on the basis of disability. Therefore, the Court grants summary judgment for Defendant on Count I.

### V.      Denial of Reasonable Accommodation (Count II)

Plaintiff presents this claim as follows:

As a qualified person with a disability, the Plaintiff requested a reasonable accommodation. An Agency employee presented various recommendations to accommodate the Plaintiff. The accommodations were reasonable; however, the Agency refused to implement the accommodations. The refusal adversely affected the Plaintiff's performance.

Compl. ¶ 57. This conduct allegedly violated the Rehabilitation Act of 1973. To establish a claim under this cause of action, Plaintiff must prove that: 1) he was disabled under the Act; (2) his employer had notice of his disability; (3) he could perform the essential functions of the position for which he was hired with reasonable accommodation; and (4) the employer refused to make this reasonable accommodation. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

First, the Court notes that Plaintiff's complaint is not clear as to what specifically he means by "reasonable accommodation." At first glance, it appears that Plaintiff is referring solely to the ergonomic consultation recommendations. However, Plaintiff clarifies in his response that he is also referring to the refusal to provide leave.

Defendant claims that the accommodation of medical leave was not required because Plaintiff was responsible for the breakdown in communications regarding his need for an accommodation, citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996). In that case, an employee sued her former employer for not providing reasonable accommodations at work. The Seventh Circuit granted summary judgment for the employer, as the employee failed to provide sufficient information to show that she needed an accommodation. The court, in support of this decision, noted that:

> The fact that the missing information concerns the employee's medical condition might not always indicate that the employee is responsible for failing to specify a necessary accommodation, but where, as here, the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts.

*Id.* at 1137.

Defendant argues that Plaintiff did not provide sufficient paperwork to show that he was incapacitated from working. Defendant's efforts to obtain this paperwork mirror those found in *Beck*. Plaintiff provided doctors notes stating that he should be excused from working on a week-to-week basis, but Defendant explained that this was not sufficient. Defendant repeatedly told

Plaintiff that his doctor needed to provide a letter stating that he was "incapacitated" from working, and Plaintiff's doctor—for whatever reason—never provided documentation stating that Plaintiff was "incapacitated." In a situation like this, Plaintiff has not created a genuine issue of material fact as to Defendant's failure to provide the reasonable accommodation of disability-based leave.

Now, the Court turns to Defendant's failure to provide a more ergonomic workspace. Defendant points out that Plaintiff did not ask for an ergonomic consultation until the end of October—around ten months into his employment. As explained in Section IV, Plaintiff has created a genuine issue of fact as to the existence of his disability and Defendant's awareness of this disability. Furthermore, Plaintiff creates a genuine issue of fact as to his ability to perform the essential functions of his job with the assistance of ergonomic adjustments in his workspace. *See* E-mail from George Disney, Nov. 14, 2008, Ex. 17, ECF No. 40-17 (the industrial hygienist who performed Plaintiff's ergonomic consultation stating that "[t]he aforementioned recommendations I feel will help him physically and mentally and will help him become a more productive employee"). Defendant argues that although the industrial hygienist made ergonomic recommendations, Defendant was not required to implement those suggestions because they would have been futile. Specifically, Defendant argues that an accommodation would not have remedied Plaintiff's performance problems. However, the e-mail from the hygienist quoted above suggests otherwise. Therefore, Plaintiff has created a genuine issue as to the ability of these accommodations to allow him to perform his job properly.

Defendant argues that by the time the ergonomic evaluation was completed, supervisory staff were already considering recommending that Plaintiff be fired. See E-mails, Interrog. 5 at 144, ECF No. 34-1. Therefore, Defendant argues, it would have been unreasonable to enact the

accommodations. It appears to the Court that Defendant would have enacted reasonable accommodations for an individual who would be at that office for the foreseeable future. Here, however, there was an impending decision to terminate Plaintiff around the same time the ergonomic recommendations were made. It was this impending termination that caused Defendant not to enact the accommodations; the Court finds no other reason for Defendant's decision not to enact them. Therefore, it cannot be said that Defendant rejected the accommodations in bad faith. *See Beck*, 75 F.3d at 1135; *Williams*, 871 F.2d at 457 (discussing how closeness in timing between termination and the protected activity is not on its own dispositive in light of Defendant's proffer of a legitimate reason for termination, which was not rebutted). Furthermore, Plaintiff offers no evidence that his medical condition affected his work performance prior to his extended leave in September and October. Plaintiff did not request any ergonomic adjustments until he had been at the Office for over nine months. Therefore, the Court finds that Plaintiff has not created a genuine issue of material fact on this claim.

Defendant points out that Ms. Commons allegedly made the independent decision to ultimately terminate Plaintiff while unaware of Defendant's physical limitations. This matters, according to Defendant, because a director's independent decision to terminate an employee—as compared to merely "rubber stamping" another employee's termination recommendation—interrupts any wrongful motive that lower employees had in making the recommendation. *See Long v. Eastfield Coll.*, 88 F.3d 300, 307-08 (5th Cir. 1996). Although Ms. Commons was aware generally of the pain Plaintiff was experiencing—after all, Plaintiff e-mailed her directly about it, *see* Ex. 26, ECF No. 41-6—she terminated Plaintiff based on an independent determination that Plaintiff's performance scores were too low. The Court finds that Ms. Commons is an independent decision-maker in this case. Although *Long* is a retaliation case (and a causal link is

a discrete requirement in succeeding on a retaliation claim), the Court is nonetheless persuaded of the importance of Ms. Commons' independent position in this case. Therefore, based on both Ms. Commons' independent decision and the lack of a genuine issue of material fact, the Court grants summary judgment for Defendant on Count II.

## VI.  Retaliation (Count IV)

For this Count, Plaintiff alleges that "[t]he conduct of the defendant as alleged above constitutes retaliation in violation of the Rehabilitation Act of 1973; and violation of §704 (a) of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e (3) (a). Among other things, the Agency denied the Plaintiff reasonable accommodation and denied him advanced sick leave." Compl. ¶ 63.

A retaliation claim brought pursuant to Title VII of the Civil Rights Act requires the plaintiff to prove that: "(1) [he] engaged in protected activity;[12] (2) [he] suffered an adverse employment action;[13] and (3) there is a causal nexus between the protected activity and the adverse action." *Brockman*, 217 F. App'x at 206 (citing *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir. 1991)). The Supreme Court has recently opined on the causation requirement for this claim, clarifying that a retaliation claim brought under Title VII of the Civil Rights Act requires the plaintiff to show but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517

---

[12] Plaintiff is unclear in the pleadings what exact "protected activities" are alleged as part of this Count. The Court need not sort through what conduct by Plaintiff constitutes protected activity because in the end, Plaintiff fails to show a "causal nexus" between any potentially-protected activity and any potentially-adverse employment action.

[13] In Title VII retaliation cases, an "adverse employment action" has been defined as an "employer action[] that would have been materially adverse to a reasonable employee or job applicant." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

(2013) (reciting 42 U.S.C. §2000e-3(a)[14]). Title VII applies to discrimination based on race, among other forms of status discrimination,[15] but not discrimination based on disability. Therefore, in assessing Plaintiff's Title VII retaliation claim, the Court need only consider evidence of racial discrimination. Overall, based on the recitation of evidence noted earlier, the Court finds that Plaintiff has not provided sufficient evidence that, but-for racial animus, Plaintiff would not have suffered any adverse employment actions, including the denial of leave, the denial of accommodations, and Plaintiff's termination. Defendant has provided legitimate reasons for its actions, and Plaintiff has not shown these explanations to be pretextual. Therefore, Plaintiff's claim for retaliation under Title VII of the Civil Rights Act fails, even assuming that the other elements of a claim have been met.

A claim for retaliation under the Rehabilitation Act has the same three elements as a Title VII claim: 1) engagement in protected activity; 2) adverse employment action; and 3) a causal connection between the protected activity and the employment action. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 271 (4th Cir. 2001) (citing *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir. 1998)). The *McDonnell Douglas* framework applies here. *Price,* 380 F.3d at 212. Defendant argues that even if Plaintiff is regarded as having engaged in protected activities, Plaintiff does not sufficiently demonstrate a causal nexus; the only claimed nexus, according to Defendant, is that Plaintiff was treated differently the day after the ergonomic consultation took place. The Fourth

---

[14] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

[15] Title VII prohibits discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

Circuit has indicated that closeness in time between termination and a protected activity could be sufficient to show a *prima facie* causal nexus.  *See Price*, 380 F.3d at 213; *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003); *Williams*, 871 F.2d at 457.[16] However, this closeness in time is not sufficient on its own to ultimately show that a causal connection exists. *See Williams*, 871 F.2d at 457.

Even assuming that the Plaintiff has provided sufficient evidence to make a prima facie case, however, he has not succeeded in offering sufficient evidence to rebut Defendant's proffered legitimate reason for terminating him—namely, Plaintiff's poor work performance—or to rebut any other reasons given for Defendant's employment actions. *See McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir. 1991) (affirming the district court's finding that the plaintiff did not prove retaliation, where "the evidence shows that plaintiff was terminated because of her unsatisfactory job performance"). Given the legitimate reasons proffered by Defendant for its actions, as well as the lack of evidence rebutting those reasons, Plaintiff cannot succeed on his claim of retaliation under the Rehabilitation Act. *Williams*, 871 F.2d at 457;[17] *see also King*, 328 F.3d at 150-54.

As noted earlier, a director's independent decision to terminate an employee—as compared to merely "rubber stamping" another employee's termination recommendation—

---

[16] "Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." *Williams*, 871 F.2d at 457.

[17] "Cerberonics has articulated and proven legitimate nondiscriminatory and nonretaliatory reasons for appellant's termination. Other than the fact that at the time she was fired her supervisors were aware that she had filed a discrimination claim, appellant has produced no other evidence of retaliation. Plainly, mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." *Williams*, 871 F.2d at 457.

interrupts any wrongful motive that lower employees had in making the recommendation. *See Long*, 88 F.3d at 307-08 ("If . . . Aguero did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of Clark and Kelley, the causal link between Long and Reavis's protected activities and their subsequent terminations would remain intact."). This Court finds that Ms. Commons made an independent decision to terminate Plaintiff. Additionally, Plaintiff has not rebutted Defendant's legitimate reasons for its employment actions. Therefore summary judgment is granted in favor of Defendant on Count IV.

### VII.   Hostile Work Environment and Harassment (Count V)

Plaintiff argues that "the conduct of the defendant as alleged above constitutes harassment and the creation of a hostile work environment." Compl. ¶ 65. Plaintiff details this claim as follows:

> Defendant's conduct in subjecting Plaintiff to continual and on-going discrimination was outrageous and was intended to cause and did cause Plaintiff to suffer severe emotional stress. As a result, Plaintiff has been under doctors' care and continues to seek medical treatment for emotional and other illnesses.

> Defendant's conduct in subjecting Plaintiff to on-going and continual discrimination was outrageous and the defendant knew or should have known that its denial of reasonable accommodation, denial of advanced sick leave, retaliation and subjecting Plaintiff to a hostile work environment and the failure to correct the Plaintiff's work environment would be harmful to Plaintiff. The defendant and its employees refused to act and showed indifference to Plaintiffs [sic] situation.

> As a result of further [sic] and proximate result of the actions or omissions of the Defendant or its agents as alleged above in paragraphs 1 through 67, and the consequences proximately caused thereby, Plaintiff has suffered emotional trauma, humiliation, loss of benefits, distress, mental anguish, medical expenses and other related costs.

Compl. ¶¶ 66-68.

Plaintiff argues that a jury—rather than a judge—should determine whether there was a hostile work environment. However, this is the summary judgment stage, not the trial stage. Courts are empowered under the Federal Rules of Civil Procedure to determine whether a claim should survive summary judgment and proceed to trial. The Court does this while keeping in mind the requirements of summary judgment as noted in Section II.

Plaintiff suggests that this hostile work environment and harassment was the result of racial- and disability-based animus. As to disability-based discrimination, Plaintiff must present enough evidence such that a reasonable juror could find that:

> (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.

*Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (discussing requirements for recovery under the Americans with Disability Act[18]). The elements for proving a hostile work environment based on race are similar. Plaintiff must prove that the race-based harassment was: "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

Whether the discrimination was race- or disability-based, Plaintiff must show "not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." *Fox*, 247 F.3d at 178 (citation omitted); *Spriggs,* 242 F.3d at 184. "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[18] As discussed earlier, interpretation of the ADA also applies to interpretation of the Rehabilitation Act.

offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Spriggs*, 242 F.3d at 184 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). It is not sufficient for a plaintiff to merely show that he was severely stressed or felt anxiety because of his work; rather, the plaintiff must show that he experienced *hostility*. *See Spriggs*, 242 F.3d at 186 (noting that, while employed, the plaintiff "continued to subjectively perceive his work environment as racially hostile").

The Court now turns to whether Plaintiff has created a genuine issue of material fact regarding his subjective perception of hostility and whether the conduct in his workplace was objectively hostile. Plaintiff claims that, prior to his termination meeting, he felt as though he got along well with this supervisors and coaches, and that he could trust and confide in them. He never personally heard any hurtful comments from staff. Correspondence from office staff to Plaintiff was submitted into evidence. Although these communications sometimes concerned serious matters such as his poor performance and the need for medical paperwork, these communications were courteous and professional. The requests for additional paperwork documenting his incapacitation, although burdensome, were polite, and staff explained why this paperwork was needed. Plaintiff does not otherwise allege that he was exposed to any sort of uncivil communication prior to his termination. Although Plaintiff was not treated as a "favored" employee, his treatment was not severe enough to create a hostile work environment, especially where other employees that were not his race and did not have his disability were also disfavored. *See generally* Aff. of Rick Neely, Ex. 40, ECF No. 41-20. Although Plaintiff's termination meeting became quite heated, Plaintiff appears to be the person who escalated the tone of that meeting.

Although it may be true that Plaintiff experienced stress and anxiety in performing his job duties, gathering necessary paperwork, and figuring out how to balance his work demands with his medical conditions, no reasonable juror could find that Plaintiff experienced a hostile work environment, either on the basis of race or disability.[19] Furthermore, the Court notes that although Plaintiff's counsel recites the factors noted above, no attempt is made to apply them to Plaintiff's case. *See* ECF No. 40 at 18.

The Court, in making this determination, is mindful of the importance of credibility and subjectivity in claims such as this, determinations of which are best left to a jury. However, the evidence presented is simply not enough for a juror to find that a hostile work environment existed. While it is certainly possible that distasteful motives may have been working under the radar as staff interacted with Plaintiff—undetectable until his termination—this cause of action addresses severe harassment.  Therefore, the Court grants summary judgment for Defendant on Count V.

## VIII.   Conclusion

For the reasons stated above, Defendant's motion for summary judgment (ECF No. 34) is **GRANTED.**

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

---

[19] This is evident when comparing Plaintiff's situation to the work environments described in other cases. *See, e.g., Fox*, 247 F.3d at 179 (noting that evidence of a hostile work environment toward a disabled worker existed where there was "evidence not of a few isolated incidents of harsh language, teasing, or insensitivity, but rather of regular verbal harassment and occasional physical harassment over a period of nearly ten months directed at Fox because of his disability").

ENTER:     September 5, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE